# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 27, 2016

Plaintiff-Appellee,

v

No. 328532
Wayne Circuit Court
LC No. 14-007466-01-FC

DIALLO CORLEY,

Defendant-Appellant.

Before: JANSEN, P.J., and MURPHY and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault with intent to murder, MCL 750.83, assault with a dangerous weapon ("felonious assault"), MCL 750.82(1), intentionally discharging a firearm from a motor vehicle, MCL 750.234a(1), and possession of a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b(1). Defendant was sentenced to concurrent terms of 20 to 30 years' imprisonment for his assault with intent to murder convictions and two to four years' imprisonment for his felonious assault and intentionally discharging a firearm from a motor vehicle convictions, with a consecutive two-year term for his felony-firearm conviction. We affirm defendant's convictions, but remand for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Calvin Wray testified that on April 21, 2014, at 8:40 p.m., he was walking eastbound on Avalon in Highland Park when he noticed a red Mountaineer driving on the wrong side of the street approach him from behind. Wray noted that the window was rolling down and that defendant, who had some facial hair and a "dreads" hairstyle, was the driver. Wray testified that the vehicle stopped, that it was close enough for him to almost touch it, and that defendant pointed a revolver out of the window and the gun fired five or six times. Wray was struck in his neck, right hand, upper chest, right leg, right thigh, and testicle. According to Wray, after the shooting, Anthony Day and a neighbor came out to assist him.

Anthony Day testified that he had been at a barbeque at Wray's house when he heard five or six shots, ran to the front, and saw Wray sitting on the ground in front of a neighbor's house, bleeding. According to Day, Wray told him that "Diablo" had shot him. Wray also later identified defendant as the shooter in a photo lineup.

-1-

Wray indicated that he "knew of" defendant, whom he knew as "Diablo," because they both lived in Highland Park, a small city, and were within the same age range. But Wray stated that he had never before talked to defendant and that he did not have any "beef" with defendant before the assault. Wray admitted, however, that he was associated with an organization called "BTA," which he described as a rap group; he denied that it was a gang. He noted that "BTA" stands for Buena Vista, Tyler, and Avalon, which are street names in Highland Park. Wray also testified that he knows of the Winona Boys, which, he stated, are a gang. Wray explained that Tyler turns into Winona at Woodward Avenue. Wray explained that there is tension between the Winona Boys and the BTA, and that defendant was associated with the Winona Boys. Day testified that there was never a conflict between the two groups, although there were arguments.

After presenting Wray's and Day's testimony, the prosecution rested. Defendant did not present a case, choosing instead to argue that Wray was not a credible witness and that the prosecution had not established identity beyond a reasonable doubt. The jury deliberated and found defendant guilty of all counts.

While this appeal was pending, this Court granted defendant's motion to remand, remanding to the trial court "for an evidentiary hearing and decision whether defendant-appellant was denied the effective assistance of counsel or should be granted a new trial on the basis of newly discovered evidence." *People v Corley*, unpublished order of the Court of Appeals, entered November 24, 2015 (Docket No. 328532). Defendant had claimed that his trial counsel failed to investigate and present several witnesses, including Stanley Davis, Jr., and Justin Mason, who were listed as witnesses on the police report, and Detective Paul Thomas, who had indicated that Wray was shot with an automatic weapon, which Wray denied at trial. Defendant also alleged that his trial counsel was ineffective for failing to object to several instances of prosecutorial misconduct and for failing to object to unconstitutional judicial fact-finding. Finally, defendant asserted that a new witness would testify to a version of the shooting that would directly contradict Wray's trial testimony.

On remand, Desiree Edwards, an investigator, testified that she received a request to investigate potential witnesses in this case and was able to locate and make contact with Stanley Davis, Jr., after obtaining his name and address in a police report. Edwards also contacted Tarryl Johnson even though the only information she had to find him was a Facebook name, Yung Ryl. She received that name from defendant's mother, who had learned that a family friend knew someone who may have witnessed the shooting.

Johnson testified that on April 21, 2014, as he was walking up Avalon, he saw a shooting. He testified that he saw a young man moving quickly between two houses and another young man on the same side of the street who had a "scared look," that the first man said something in a taunting manner and fired at least three shots as the second man began to turn and run, and that the first man then ran back between the houses. Johnson described the gun as a black semi-automatic and the shooter as a black male with a dark complexion who was about 5'8" tall and had a close-cropped "waves" hairstyle. Johnson denied seeing a red Mountaineer on the street. Johnson also testified that he only told an acquaintance about the shooting and that he did not want to become involved because he "didn't trust the system." He admitted that he had previously been involved in a shooting and had been convicted of "second degree and armed robbery."

Stanley Davis, Jr., who lived on Avalon, testified that he was working on his van in his backyard on April 21, 2014, at approximately 8:30 p.m. when he heard about five shots. He said that 10 to 15 minutes later, he went to the front of his house and saw somebody lying on the curb. When he realized that it was his neighbor, Calvin Wray, he ran over to aid him. Davis testified that he saw people sitting on the porch of Wray's house, but that he was the only civilian to offer assistance to Wray, that nobody else tried to speak with Wray, and that Wray never said who shot him. Davis did not see a red Mountaineer. Davis further testified that he did not have any contact with defendant's trial attorney, Randall Upshaw, or an investigator for Upshaw, before the trial in June of 2015.

Upshaw testified that he was unaware of Johnson's potential testimony at the time of trial. As for Davis, Upshaw explained that he unsuccessfully tried to contact him by phone and by sending someone out to locate him. Regarding Detective Thomas's police report, in which Wray purportedly made a statement that the gun used was a dark automatic, Upshaw explained that he considered calling Thomas to contradict Wray's testimony but, concerned that Thomas would state that he may have made a mistake, determined that it was better strategy to simply impeach Wray with the report. Upshaw summed up his defense theory by saying that he thought he could create reasonable doubt by showing that Wray was not telling the truth.

The trial court denied defendant a new trial.

## II. PROSECUTORIAL MISCONDUCT

Defendant first claims that he was denied a fair trial due to several instances of prosecutorial error. We disagree.

### A. STANDARD OF REVIEW

Defendant failed to preserve his claims of prosecutorial misconduct by "contemporaneously object[ing] and request[ing] a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Thus, we review defendant's unpreserved claims for plain error affecting substantial rights. *Id.* at 475-476, citing *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To demonstrate such an error, the defendant must show that (1) an error occurred, (2) the error was clear or obvious, and (3) "the plain error affected [the defendant's] substantial rights," which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. Further, [this Court] cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Bennett*, 290 Mich App at 476 (quotation marks and citations omitted; alteration in original). See also *People v Unger*, 278 Mich App 210, 234–235; 749 NW2d 272 (2008) ("Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice.").

-3-

We review prosecutorial misconduct claims on a case-by-case basis, examining the prosecutor's remarks in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010); *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007). "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011).

B. ANALYSIS

1. GANG EVIDENCE

Defendant first claims that the prosecutor improperly elicited evidence of defendant's gang affiliation to create a motive for the crime. He argues that this evidence was not relevant because the conduct relating to the crimes at issue in this case was not connected to his gang affiliation and that this evidence constituted improper character evidence and was unfairly prejudicial. We reject defendant's claims.

The prosecution denies that it sought admission of the gang-related evidence for the purpose identified by defendant on appeal. However, even if we assume that defendant is correct that the prosecution elicited testimony regarding his gang affiliation in order to establish a motive for the crime, defendant cannot establish that the prosecution committed misconduct on this basis.

"A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *Dobek*, 274 Mich App at 70. Thus, if the evidence is "arguably admissible," we will not deem the prosecutor's actions to be a bad-faith effort to admit improper evidence constituting prosecutorial misconduct. See *id.*

Here, the gang-related evidence was arguably admissible for a proper purpose. The prosecutor first referenced the Winona Boys near the end of his direct examination of Wray, asking Wray if he was familiar with the group, without referring to it as a gang. Wray eventually referred to the Winona Boys as a gang, but not until cross-examination, when defense counsel questioned Wray about a lie he had told to his physical therapist to avoid connecting himself to gang violence.

Except as otherwise provided, all relevant evidence is admissible. MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The primary fact of consequence in this case was whether defendant was the shooter. When considered together, evidence that defendant was associated with the Winona Boys, that the victim was associated with the BTA, and that the two groups did not like each other tends to make it more probable that defendant was, in fact, the perpetrator. In fact, evidence of defendant's gang affiliation was the only evidence admitted at trial that suggested a motive, *i.e.*, that defendant shot Wray multiple times because Wray was a member of a rival group. See MRE 404(b) (stating that evidence of other cries, wrongs, or acts is admissible as proof of motive); *People v Starr*, 457 Mich 490, 496-497; 577 NW2d 673 (1998). Moreover, Wray stated, referring to defendant, that he "know[s] his face, his description, and he associates with people who don't like me." Thus, evidence of defendant's gang association was relevant to

-4-

show how Wray was able to recognize his attacker. See *id*. (stating that evidence of other crimes, wrongs, or acts is admissible as proof of identity); *Starr*, 457 Mich at 496-497. Therefore, evidence that defendant was associated with the Winona Boys was admissible for improper character purposes, but for the proper purposes of showing motive and identity.

Additionally, the evidence was not unfairly prejudicial. See MRE 403. "Unfair prejudice exists only where either a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect, or it would be inequitable to allow the proponent of the evidence to use it." *People v Murphy (On Remand)*, 282 Mich App 571, 583; 766 NW2d 303 (2009) (quotation marks and citation omitted). Again, the evidence of defendant's association with the Winona Boys and the victim's association with a rival group was highly probative, as it was the only evidence that possibly explained defendant's motive, and it also helped explain how the victim was able to recognize defendant. Given that there was no evidence indicating what types of crimes or acts, if any, that the Winona Boys were known to commit, there was little likelihood that the jury would attribute disproportionate weight to this evidence. See *id*.

Therefore, because this evidence was admissible, see MRE 401, 402, 403, and 404, it does not support a finding of prosecutorial misconduct, see *Dobek*, 274 Mich App at 70.

## 2. DENIGRATING DEFENSE COUNSEL

Defendant also claims that the prosecutor committed misconduct by improperly denigrating defense counsel on two occasions. While "a prosecuting attorney may not personally attack defense counsel," *People v McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003), we disagree with defendant's characterization of the prosecutor's statements.

At trial, defense counsel highlighted inconsistencies in the victim's prior statements, including a misrepresentation that he had made about his name at the preliminary examination. During direct examination, the prosecutor asked Wray why he previously denied having a middle name, and Wray responded, "His lawyer was antagonizing me when I was on the stand." The prosecutor then moved on to another subject. Later, the prosecutor made a fleeting reference to the defense attorney that previously questioned Wray, asking Wray if his prior statements may have been ambiguous because the defense attorney's questions were "rattling" him. After Wray answered affirmatively, the prosecutor again moved on to a different subject. When viewed in context, it is clear that the prosecutor was trying to rehabilitate Wray regarding the prior inconsistent statement that defense counsel referred to during his opening statement. Likewise, it is clear that Wray was attempting to explain his prior statements when he mentioned defendant's attorney during his testimony. He was not attacking defendant's trial counsel, and neither was the prosecutor. Lastly, and most significantly, it is clear from the record that the exchanges challenged by defendant on appeal both referenced defendant's *previous* attorney, who represented him at the preliminary exam, not his trial counsel, and defendant's trial counsel made this fact clear to the jury.

On this record, we find no basis for a finding of prosecutorial misconduct.

## 3. PERSONAL BELIEFS

Next, defendant argues that the prosecutor repeatedly made improper arguments during that trial that were based on his personal belief and confidence in the prosecution's case. We disagree.

Prosecutors are generally "afforded great latitude regarding their arguments and conduct," and "[t]hey are free to argue the evidence and all reasonable inferences from the evidence." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (quotation marks and citation omitted). However, they "should not resort to civic duty arguments that appeal to the fears and prejudices of jury members or express their personal opinion of a defendant's guilt, and must refrain from denigrating a defendant with intemperate and prejudicial remarks." *Id*. at 282-283. Likewise, a prosecutor may not vouch for a witness's credibility or improperly bolster a case using the prestige of their office. *People v Reed*, 449 Mich 375, 398; 535 NW2d 496 (1995). Notably, however, the "propriety of the prosecutor's comments does not turn on whether or not any magic words are used. The critical inquiry is not whether the prosecutor said 'We know' or 'I know' or 'I believe,' but rather whether the prosecutor was attempting to vouch for the defendant's guilt." *Reed*, 449 Mich at 399 (quotation marks and citation omitted).

When viewed in context, it is clear that the prosecutor used the phrases "in the People's belief" and "I believe" to refer to the strength of the case, not the prosecutor's personal belief in defendant's guilt. See *Dobek*, 274 Mich App at 63-64. The "in the People's belief" reference was made during an argument designed to draw the jury's attention away from one of Wray's credibility issues. The prosecutor pointed out that Wray's prior inconsistent statement regarding the gun used in this crime had no impact on his identification of defendant. Accordingly, despite his reference to "the People's belief," it is apparent that the prosecutor was not vouching for the credibility of a witness or using the prestige of his office. Rather, he was deemphasizing contested testimony at trial in order to explain why Wray's identification of defendant should not be affected by Wray's alleged lack of credibility with regard to a separate detail of the crime. See *Bahoda*, 448 Mich at 282. Additionally, the "I believe" remark was made immediately after the prosecutor said, "Our judge will give us instructions as to the law. Apply those to the facts and do that which is just." In context, it is clear the prosecutor was instructing the jury to consider the evidence and was arguing that the evidence proved the prosecution's theory of the case. The prosecutor committed no error.

Defendant also cites this statement as prosecutorial error: "This is going to be credibility. Whom do you believe and why? And the answer, I think, really is, is that Mr. Calvin Wray bore testimony as accurately and as correctly and as politely as he could." This statement was as proper argument based on the evidence on the trial and the significance of Wray's credibility in this case. We find significant the fact that it was made after the prosecutor pointed out evidence of a potential motive and before he cited other evidence adduced at trial. See *Bahoda*, 448 Mich at 282 (stating that prosecutors are free to argue the evidence admitted at trial). In addition, even though "a prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness," a prosecutor is permitted to "comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). It is apparent from the trial testimony that the question of defendant's guilt solely depended on whether the jury believed the single identification witness in this case (*i.e.*, the victim, Wray). The prosecutor's comment, that he

believed that Wray was telling the truth, did not imply any special knowledge; it merely suggested that the prosecutor filed charges against defendant and placed Wray on the stand to identify defendant because the prosecutor believed Wray's identification was accurate based on the description of who shot him. Moreover, this statement came right after the prosecutor noted that defendant had impeached Wray's testimony with evidence of a crime containing an element of theft. Read as a whole, it is clear that the prosecutor was attempting to point out that the impeachment evidence did not diminish Wray's credibility. In the context of this case, the prosecutor's argument constituted a proper comment on his own witness's credibility. See *Thomas*, 260 Mich App at 455.

Moreover, the court instructed the jury that the attorneys' arguments were not evidence. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial comments, and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (citations omitted). Thus, if there were any error in the prosecutor's statements, it was harmless.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant next claims that there was insufficient evidence to support his convictions. Particularly, he argues that there was insufficient evidence identifying him as the perpetrator or to establish that he had an actual intent to kill. We reject defendant's claims.

## A. STANDARD OF REVIEW

This Court reviews a challenge to the sufficiency of the evidence *de novo*. *People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences arising [from the evidence] may constitute proof of the elements of [a] crime." *Bennett*, 290 Mich App at 472. This Court's review is deferential, as "the trier of fact, not the appellate court, determines what inferences may be fairly drawn from the evidence and the weight to be accorded those inferences." *People v Malone*, 287 Mich App 648, 654; 792 NW2d 7 (2010), overruled in part on other grounds by *People v Jackson*, 498 Mich 246, 268 n 9 (2015). See also *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

## B. ANALYSIS

"The elements of assault with intent to commit murder are: (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Brown*, 267 Mich App 141, 147-148; 703 NW2d 230 (2005) (quotation marks and citations omitted).[1] A

---

[1] Defendant largely focuses on the lack of evidence of premeditation with regard to this claim. However, premeditation is neither an element of assault with intent to commit murder, *Brown*,

jury may infer the intent to kill from any facts in evidence. *Unger*, 278 Mich App at 223. "Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill." *Id.* Intent to kill

> may be gleaned from the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made. [*Brown*, 267 Mich App at 149 (quotation marks and citation omitted).]

Wray testified that defendant was close enough that he could almost touch the vehicle when defendant pointed a revolver toward Wray and fired five or six times. The bullets struck Wray in the neck, hand, chest, leg, and testicle. Considering defendant's act of pointing a gun at Wray from a short distance and firing multiple shots, and the fact that a gun is naturally adapted to cause death, especially when fired at critical body parts, a reasonable jury could conclude that defendant intended to kill Wray. See *id*.

Moreover, an element of every crime is identity. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). Whether identification testimony is credible is a question for the jury. *Id.* Here, Wray unequivocally testified that defendant was the shooter, stating that he was "a hundred percent" confident. The jury chose to believe Wray's testimony. Because witness identification may sufficiently support a conviction, and because this Court should not disturb a jury's credibility determinations, see *Nowack*, 462 Mich at 400; *People v Milstead*, 250 Mich App 391, 404; 648 NW2d 648 (2002), there was sufficient evidence to support defendant's convictions.

## IV. GREAT WEIGHT OF THE EVIDENCE

Defendant also claims that his convictions were against the great weight of the evidence. We disagree.

## A. STANDARD OF REVIEW

Defendant properly preserved this issue by raising it in a motion for a new trial. See *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003).

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would

267 Mich App at 147-148, nor his other offenses, see MCL 750.227b(1); *People v Bosca*, 310 Mich App 1, 20; 871 NW2d 307 (2015), appeal held in abeyance 872 NW2d 492 (Mich 2015) (stating the elements of assault with dangerous weapon); *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999) (stating the elements of felony-firearm). See also M Crim JI 11.37 (stating the elements of discharge of a firearm from a motor vehicle).

be a miscarriage of justice to allow the verdict to stand. Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial. [U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination. [*Id*. at 218-219 (quotation marks and citations omitted; alteration in original).]

See also *People v Lemmon*, 456 Mich 625, 642-647; 576 NW2d 129 (1998); *Unger*, 278 Mich App at 232.

## B. ANALYSIS

While other evidence connecting defendant to the crime may have been limited, Wray's testimony that defendant was the shooter sufficiently supports the convictions. Wray's description of the assault was believable, and defendant did not offer any contradictory evidence. Instead, defendant's trial strategy was to discredit Wray's testimony through several impeachment attempts. On appeal, defendant emphasizes several instances of inconsistent statements by Wray which he claims demonstrate that the verdict was against the great weight of the evidence: (1) Wray's statement to his therapist that he was shot in a robbery, (2) Wray's statement that he never told a police officer that the weapon used was an automatic, and (3) Wray's conflicting statements about a passenger in the vehicle. However, at trial, Wray explained (1) that he told his therapist that he was shot in a robbery to avoid the stigma associated with gang violence, (2) that the police officer may have incorrectly listed in his report the type of gun used, and (3) with respect to the passenger, that he saw another person in the car but was unable to see his face. None of the inconsistent statements deprived Wray's testimony "of all probative value" or "contradicted indisputable physical facts or defied physical realities." *Musser*, 259 Mich App at 218.

Thus, we conclude that the evidence does not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow it to stand.

## V. JUDICIAL FACT-FINDING

Next, defendant claims that he is entitled to resentencing because the trial court scored offense variable ("OV") 4, MCL 777.34, and OV 5, MCL 777.35, using unconstitutional judicial fact-finding. As the prosecution concedes, we agree that defendant's constitutional rights were violated at sentencing, but conclude that the appropriate remedy is a *Crosby*[2] remand, as outlined in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

## A. STANDARD OF REVIEW

---

[2] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

Because defendant failed to preserve this issue by objecting to the court's scoring of the OVs based on the line of reasoning stemming from *Apprendi v New Jersey*, 530 US ___; 120 S Ct 2348; 147 L Ed 2d 435 (2000), and *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), we review this unpreserved claim for plain error affecting substantial rights. *Lockridge*, 498 Mich at 392. "To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights." *Id.* at 392-393.

## B. ANALYSIS

In *Lockridge*, 498 Mich at 364, our Supreme Court concluded that Michigan's sentencing guidelines were "constitutionally deficient" to the extent that "the guidelines *require[d]* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase[d] the floor of the guidelines minimum sentence range, i.e., the 'mandatory minimum' sentence under *Alleyne*." To cure the constitutional violation, the Court "sever[ed] MCL 769.34(2) to the extent that it is mandatory and [struck] down the requirement of a 'substantial and compelling reason' to depart from the guidelines range in MCL 769.34(3)." *Id.* at 391-392. The Court concluded that a *Crosby* remand, so that the trial court may determine whether it "would have imposed a materially different sentence but for the constitutional error," is appropriate for "all defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure." *Id.* at 395-396. In "cases in which facts admitted by a defendant or found by the jury verdict were *insufficient* to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced[,] . . . an unconstitutional constraint actually impaired the defendant's Sixth Amendment right." *Id.* at 395.

The record shows that the trial court assessed 10 points for OV 4 and 15 points for OV 5 based on judicial fact-finding. Ten points shall be assessed for OV 4 if "[s]erious psychological injury requiring professional treatment occurred to a victim," MCL 777.34, and 15 points shall be assessed for OV 5 if the same occurred to a victim's family, MCL 777.35. None of defendant's convictions required a jury finding of any psychological injury, and defendant did not admit that psychological injury occurred. Without the 10 points scored under OV 4 and the 15 points scored under OV 5, defendant's total OV score is reduced from 105 to 80, which in turn reduces the minimum range calculated under the guidelines from 171 to 285 months to 135 to 225 months.[3]

Therefore, because defendant's guidelines minimum sentence range was actually constrained by a Sixth Amendment violation and he was not subject to an upward departure, defendant is entitled to a *Crosby* remand. See *Lockridge*, 498 Mich at 395-396.

---

[3] Although neither party raises this issue, we note that the trial court also used judicial fact-finding to assess 25 points for OV 3 based on a "[l]ife threatening or permanent incapacitating injury occur[ing] to a victim." MCL 777.33. Although Wray likely suffered a life threatening injury, none of defendant's convictions required the jury to make such a finding.

## VI.  NEWLY DISCOVERED EVIDENCE: JOHNSON'S TESTIMONY

Defendant argues that he is entitled to a new trial based on newly discovered evidence, namely, Tarryl Johnson's eyewitness testimony.  We disagree.

### A.  STANDARD OF REVIEW

We review for an abuse of discretion a trial court's decision whether to grant a motion for a new trial.  *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012).  "An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *Id*.  "Underlying questions of law are reviewed de novo, while a trial court's factual findings are reviewed for clear error."  *People v Terrell*, 289 Mich App 553, 559; 797 NW2d 684 (2010) (citations omitted).

### B.  ANALYSIS

Absent unusual circumstances, it is the parties' responsibility to take reasonable efforts to assemble all relevant evidence by the time of trial.  *Rao*, 491 Mich at 280.  Accordingly, a new trial may be granted based on newly discovered evidence only the defendant demonstrates that "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial."  *Id*. at 279 (quotation marks omitted), quoting *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003).

We agree with the trial court, as well as both defendant and the prosecution, that defendant established the first three elements of the *Cress* test in this case.  However, under the fourth prong, the trial court concluded that the newly discovered evidence did not make a different result probable on retrial, see *Rao*, 491 Mich at 279, because it believed that Johnson's testimony at the *Ginther* hearing was not credible.  A trial court has the discretion to evaluate the credibility of a witness in deciding a motion for a new trial, *Cress*, 468 Mich at 692; *People v Mechura*, 205 Mich App 481, 484; 517 NW2d 797 (1994), and there is significant evidence in the record supporting the trial court's credibility determination in this case.

First, the court noted that even though Johnson allegedly witnessed the shooting from across the street, he immediately left the area "and resumed his regular activities" without rendering any aid to the victim.  Johnson's testimony confirms this finding, as he testified that he quickly left and took no other action except calling the acquaintance who lived nearby—whom Johnson had just met before the shooting—to express his irritation that his meeting with the acquaintance had caused Johnson to be in close proximity to the shooting.  Notably, Johnson testified that he mentioned the shooting to no one else besides that acquaintance, and he never spoke with the acquaintance again.

The trial court also mentioned Johnson's prior conviction for armed robbery, noting that he could be impeached during a new trial with this conviction, see MRE 609, and "to put his testimony on par with that of Calvin Wray and Anthony Day is a stretch."  Consistent with the trial court's conclusion, Johnson specifically testified that he had been the codefendant in a previous shooting related to an armed robbery.  He also later stated that that he "didn't trust the

system" and "did not want to be involved" given his "history and all of that." In considering Johnson's convictions and significant prison sentence, and the fact that he could only offer minimal information, solely based on general physical features, regarding the identity of the "true" shooter, it seems likely that a jury would conclude that Johnson's testimony was unreliable and that he may have had an incentive to offer testimony favorable to the defense given his distrust of the criminal justice system.

There also was no indication that Wray was the victim of the shooting that Johnson observed. Johnson initially testified that he saw the victim, and even noticed that the victim had a scared expression on his face when the shooter was coming towards him, but he later stated that he "didn't really pay attention to the victim because . . . [he] didn't need to." Likewise, no testimony was elicited from Johnson that in any way identified the victim as Wray. Further, Johnson later confirmed, with regard to the victim, "I don't even know what he looks like, not face like [sic]." In addition, there were numerous discrepancies between Wray's testimony and Johnson's testimony, including the essential facts regarding the manner in which the shooting occurred.

In sum, Johnson's criminal history and statements on the record demonstrated a significant likelihood that the jury would conclude that his testimony was not credible. Additionally, Johnson's testimony differed to such an extent from Wray's that it seems unlikely that a jury would conclude that Johnson's testimony provided the more accurate account of the shooting in which Wray was injured—especially given the fact that there is no indication that Wray was the victim of the shooting that Johnson observed. On this record, the trial court's conclusion that a different outcome was not probable on retrial and its denial of defendant's motion for a new trial were not outside the range of principled outcomes. See *Rao*, 491 Mich at 279.

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next claims that he was deprived of his right to the effective assistance of counsel. We disagree.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

"A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008), citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

Effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise. To demonstrate ineffective assistance, defendant must show: (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that this performance so prejudiced him that he was deprived of a fair trial. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the

proceeding would have been different. [*People v Gaines*, 306 Mich App 289, 300; 856 NW2d 222 (2014) (quotation marks and citations omitted).]

## B. ANALYSIS

Defendant argues that defense counsel was ineffective for failing to investigate and call Justin Mason, Stanley Davis, Jr., and Detective Thomas as defense witnesses. We disagree.

"Trial counsel is responsible for preparing, investigating, and presenting all substantial defenses," *i.e.*, defenses "that might have made a difference in the outcome of trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (quotation marks and citation omitted). "Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (quotation marks and citation omitted). "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *Dunigan*, 299 Mich App at 589-590.

Regarding defense counsel's failure to call Mason, defendant argues that Mason was listed in the initial police report as a witness and that he could have provided critical information to support the defense. Defendant provides no argument regarding why failing to call him as a witness at trial was objectively unreasonable. Further, Mason did not testify at the *Ginther* hearing, and defendant has provided no information regarding Mason's potential testimony. Thus, because defendant has not provided a factual predicate for his claim, we cannot conclude that defense counsel was objectively unreasonable when he failed to call him as a witness. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) ("Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim.").

Defense counsel also was not ineffective for failing to call Davis. Defendant claims that Davis' testimony would have contradicted Day's testimony and corroborated Johnson's version of the events. While Davis testified that he was the only civilian to assist Wray and that Wray was not able to tell him who the shooter was, Davis also testified that he did not go to the front of his house until 10 to 15 minutes after the shooting. It is very plausible that Day could have heard Wray tell him who the shooter was before Davis arrived on the scene. And Wray himself testified at trial that he did not tell anyone who the shooter was, so Davis' potential testimony did not deprive defendant of a substantial defense. See *Dixon*, 263 Mich App at 398. With regard to defendant's claim that a portion of Davis' testimony corroborates Johnson's depiction of the shooting, defendant cites Davis' statements that there were people on Wray's porch looking toward "Second" and that there was no red Mountaineer in the area. These statements do not confirm anything of substance. While Johnson may have testified that he saw the shooter come from houses in the area near "Second," that was also the direction in which Wray was heading when he was shot, so it would be appropriate that observers would be looking in that direction. And Davis's statement that there was no red Mountaineer in the area does not corroborate Johnson's testimony because, again, Davis did not go to the front of his house until 10 to 15

minutes after he heard the gunshots, leaving plenty of time for the vehicle to flee the area. Thus, Davis' testimony would not have provided a substantial defense, and counsel was not ineffective for failing to call him as a witness. See *id.*

With regard to Detective Thomas, defendant contends that defense counsel was ineffective when he failed to call Thomas to impeach Wray's testimony that he never told Thomas that the shooter used an automatic weapon, as Thomas' report indicated that Wray did, in fact, tell him that the weapon was automatic. Defendant again fails to provide a factual predicate for his claim, as he has provided no testimony or affidavit indicating what Thomas's testimony would be. See *Carbin*, 463 Mich at 600. Nevertheless, trial counsel testified at the *Ginther* hearing that he decided not to call Thomas for the following reasons:

> Because *I knew I was going to use the statement that was signed there saying a dark automatic.* And the times I questioned the officer and the officer admitted that maybe he made a mistake. As the judge stated, sometimes the officer is not typing as the same time. I thought I can contradict Mr. Wray up enough by showing that -- making him admit that it was an automatic on the list; that his [signature] was at the bottom; that he had read it, and that it would be less of a gamble to make Mr. Wray look more like he's telling an untruth than trying to put an officer up there who sometimes, in my bias [sic] opinion, make [sic] excuses for a typo.

Given this reasoning, defense counsel's failure to call Detective Thomas did not fall below an objective standard of reasonableness. See *Gaines*, 306 Mich App at 300. Further, the content of this impeachment evidence was, in effect, presented at trial when Wray admitted that Thomas' report stated that Wray had indicated that the weapon was an automatic, even though Wray testified that the information was inaccurate. Thus, failing to call Thomas as a witness at trial did not deprive defendant of a substantial defense. See *Dixon*, 263 Mich App at 398.

Defendant also claims that trial counsel was ineffective for failing to object to the instances of prosecutorial misconduct previously discussed and for failing to object to judicial fact-finding at sentencing. But, as explained *supra*, defendant's prosecutorial misconduct claims are without merit. Counsel is not ineffective for failing to make a futile objection. *Unger*, 278 Mich App at 257. And given our conclusion that defendant is entitled to a *Crosby* remand on the judicial fact-finding issue, we need not separately consider whether he received ineffective assistance of counsel in the lower court on this basis, especially given the fact that defendant would be entitled to the same remedy in this appeal had defense counsel objected. *People v Stokes*, 312 Mich App 181, 200-203; 877 NW2d 752 (2015) (holding that the *Crosby* remand procedure should apply to preserved as well as unpreserved errors).

## VIII. CONCLUSION

Defendant has failed to establish that any of his claims warrant relief, except to the extent that we agree that he is entitled to a *Crosby* remand due to the fact that judicially found facts were used to increase the minimum range calculated under the sentencing guidelines.

-14-

We affirm defendant's convictions, but remand this case for further proceedings consistent with this opinion.  We do not retain jurisdiction.


/s/ William B. Murphy
/s/ Michael J. Riordan